# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

KARISSA JEAN MOODY,

      **Plaintiff,**

                               **Case No. 2:18-cv-540**
     **v.**                          **JUDGE MICHAEL H. WATSON**
                               **Chief Magistrate Judge Elizabeth P. Deavers**

COMMISSIONER OF SOCIAL
SECURITY,

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Karissa Jean Moody, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits and supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 8), the Commissioner's Memorandum in Opposition (ECF No. 14) and the administrative record (ECF No. 7). Plaintiff did not file a Reply. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED**.

## I.    BACKGROUND

Plaintiff filed applications for disability insurance benefits and supplemental security income on December 9, 2014, alleging that she had been disabled since September 9, 2014. (R. at 189–203.) Plaintiff's applications were denied initially and upon reconsideration. (R. at 137–42, 144–48.) Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 151–

52.)  Administrative Law Judge ("ALJ") Gregory Moldafsky held a hearing on May 11, 2017, at which Plaintiff, who was represented by counsel, appeared and testified.  (R. at 44–78.)  On August 29, 2017, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 16–29.)  On April 3, 2018, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1–4.)  Plaintiff then timely commenced the instant action.

## II.    RELEVANT HEARING TESTIMONY

Plaintiff testified at the administrative hearing about her narcolepsy and cataplexy episodes, testifying as follows:

Q  So tell me about your narcolepsy and cataplexy.  How, how, how, yeah, what's the frequency?  What's that look like for you nowadays?

A  Narcolepsy is a struggle every day.  Basically, I take a medicine to stay awake, and I have to take something to go to bed. And I really –

Q  So you just feel excessively tired during the day?

A  All the time, and when I have a cataplexy it's ten times worse.  It's almost like a seizure.  It drains you.

Q  Sure. How often are you having those?  I know there's some triggers. You just trying to kind of avoid the triggers?

A  Right.  I can have them up to 100 times a day.  It just depends.

Q  Okay. So, I don't know necessarily think you're having 100 cataplex episodes every day, are you?

A  Yeah.

Q  That's, that's what you're going to say?  That's your average –

A  Well, not every day --

Q   -- every day?

A  -- but they have been known --

Q  That seems like a very long day.

A  -- excessive.

Q  So -- and when you're cataplexed, your legs give out and

you're able to   what happens?

A  I have no muscle tone whatsoever.  I can't hold my head up.  I can't --

Q  And how long does that last or what do you do?  What happens?

A  Sometimes they last a good two minutes, I would say.

Q  And is there any residual effects afterwards or just kind of --

A  Yeah.  I'm --

Q  -- get your --

A   I'm very exhausted after that.

(R. at 53–55.)

### III.    RELEVANT MEDICAL RECORDS

Laura Mooney, M.D., Plaintiff's treating physician, has treated Plaintiff since 2014.  (R. at 245–46.)  Dr. Mooney is certified in internal medicine and pulmonary disease and specializes in pulmonary disease and sleep medicine.  (R. at 513–15.)

On May 25, 2016, Dr. Mooney completed a medical source statement form prepared by Plaintiff's attorney that related to Plaintiff's mental limitations.  (R. at 402–04.)  The form included the following definitions:

| | | |
|---|---|---|
| None | = | No limitations. |
| Mild | = | Unable to function in this area less than 10% of the work day or work week. |
| Moderate | = | Unable to function in this area from 11% to 25% of the work day or work week. |

|          |   |                                                              |
|----------|---|--------------------------------------------------------------|
| Marked   | = | Unable to function in this area from 26% to 50% of the work day or work week. |
| Extreme  | = | Unable to function in this area over 50% of the work day or work week. |

(R. at 402.)

As to her abilities to engage in social interaction, Dr. Mooney determined that Plaintiff was extremely limited in her abilities to accept instruction from or respond appropriately to criticism from supervisors or superiors, to respond appropriately to co-workers or peers, and to relate to the general public and maintain socially appropriate behavior and she was markedly limited in her ability to work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes. (*Id.*) Dr. Mooney indicated that this assessment would not change if only minimal contact or interaction with others was required. (*Id.*)

As to her abilities to maintain sustained concentration and persistence, Dr. Mooney opined that Plaintiff was extremely limited in her abilities to perform and complete work tasks in a normal work day or work week at a consistent pace, to process subjective information accurately and to use appropriate judgment, to carry through instructions and complete tasks independently, maintain attention and concentration for more than brief periods of time, to perform at production levels expected by most employers and she was markedly limited in her ability to work in cooperation with or in proximity to others without being distracted by them. (R. at 402–03.)

As to Plaintiff's adaptation abilities, Dr. Mooney determined that Plaintiff was extremely limited in her abilities to remember locations, workday procedures, and instructions, be aware of normal hazards and take necessary precautions, and tolerate customary work pressures and she was markedly limited in her abilities to respond appropriately to changes in work setting, behave

predictably, reliably and in an emotionally stable manner, and to maintain personal appearance and hygiene.  (R. at 403.)  Dr. Mooney opined that Plaintiff was likely to have partial or full day unscheduled absences from work occurring five or more days per month due to the diagnosed conditions and/or side effects of medication.  (R. at 404.)  Dr. Mooney further opined that Plaintiff's condition was likely to deteriorate if she was placed under stress, particularly the stress of a an eight-hour per day, five-day per week job.  (*Id*.)  Dr. Mooney indicated that Plaintiff's absences would result from her sleepiness and that stress causes sleep attacks and cataplexy.  (*Id*.)  According to Dr. Mooney, Plaintiff's condition existed and persisted with these restrictions since September 9, 2014.  (*Id*.)

On March 29, 2017, Dr. Mooney completed another medical source statement form prepared by Plaintiff's attorney regarding Plaintiff's narcolepsy and cataplexy and their effects. (R. at 527.)  Dr. Mooney affirmed that Plaintiff experienced episodes of narcolepsy and cataplexy.  (*Id*.)  In response to how often and of what duration the narcolepsy episodes were, Dr. Mooney responded, "several times / day x minutes to 2 hours."  (*Id*.)  In response to how often and of what duration the cataplexy episodes were, Dr. Mooney responded, "several times / day x minutes."  (*Id*.)  Dr. Mooney stated that Plaintiff has a depressed mood due to these health limitations.  (*Id*.)  Dr. Mooney again indicated that Plaintiff's condition was likely to deteriorate if she was placed under stress, particularly the stress of a an eight-hour per day, five-day per week job, and represented that her condition existed and persisted with these restrictions since September 9, 2014.  (*Id*.)  Dr. Mooney opined that stress, illness, reduced sleep, naps, and lack of medication are all known triggers / exacerbators of narcolepsy.  (*Id*.)

# IV. ADMINISTRATIVE DECISION

On August 29, 2017, the ALJ issued his decision. (R. at 16–29.) The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2019. (R. at 18.) At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially gainful activity since her alleged onset date of September 9, 2014. (*Id.*)

At step two, the ALJ concluded that Plaintiff had the following severe impairments: narcolepsy with cataplexy, depressive disorder, and anxiety disorder. (R. at 18.)

At step three of the sequential process, the ALJ concluded that that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) At step four, the ALJ assessed Plaintiff's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that she can frequently climb ramps and stairs,

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

but cannot climb ladders, ropes, or scaffolds. She should not work at unprotected heights or in close proximity to dangerous machinery. She should not perform commercial driving. The claimant is able to perform simple (as defined in the DOT at SVP levels one and two) routine, repetitive tasks; in a work environment that is not fast-paced, that is she can do work that is goal-based or measured by end result. Additionally the claimant is limited to no more than incidental interaction with the general public, and no more than occasional interaction with coworkers and supervisors. She can perform jobs where changes in job processes are setting are few, if any, and changes are explained in advance.

(R. at 21.) In reaching this determination, the ALJ assigned "little weight" to Dr. Mooney's opinions. (R. at 27.)

Relying on the VE's testimony, the ALJ determined that even though Plaintiff is unable to perform her past relevant work, other jobs exist in significant numbers in the national economy that she can perform. (R. at 28.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 29.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.    ANALYSIS

Plaintiff advances two contentions of error. Plaintiff first asserts that the ALJ erred by failing to properly evaluate the opinion of Plaintiff's treating physician, Dr. Mooney. Plaintiff next argues that ALJ also erred when he failed to recognize and thus consider Plaintiff's chronic fatigue syndrome as a medically determinable impairment. These contentions of error are addressed in turn.

### A.    Treating Physician

Plaintiff argues that the ALJ failed to properly evaluate Dr. Mooney's treating opinion, contending that it was flawed in a number of ways. (ECF No. 8 at 5–12.) For the reasons that follow, this contention of error is without merit.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c). The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect

judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ." 20 C.F.R. § 416.927(c)(2); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013); *Blakley*, 581 F.3d at 408.[2] If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

---

[2] "Revisions to regulations regarding the evaluation of medical evidence went into effect on March 27, 2017, and purport to apply to the evaluation of opinion evidence for claims filed before March 27, 2017." *Smith v. Comm'r of Soc. Sec.*, No. 3:18CV622, 2019 WL 764792, at *5 n.2. (N.D. Ohio Feb. 21, 2019) (citing 82 Fed. Reg. 5844-5884 (Jan. 18, 2017)). Plaintiff's claim was filed before March 27, 2017, before the new regulations took effect.

*Id.* Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s),"

opinions on issues reserved to the Commissioner are generally not entitled to special

significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

In this case, the ALJ considered Dr. Mooney's opinion, but assigned it "little weight,"

reasoning as follows:

> Dr. Mooney has provided opinions on several occasions related to the claimant's disability status and functional abilities. In May 2016, she indicated an opinion that the claimant was either markedly or extremely impaired in all domains related to mental functioning. I note that this is a noncompliant form provided by the claimant's attorney that redefines SSA vocational terms in such a way that a finding of other than "no limitations" becomes arguably work preclusive. Terms such as mild, moderate, marked, and extreme are defined by SSA in a way that indicates the severity of the limitation of functioning. On the attorney's form, the terms are redefined to indicate the percentage of the day during which the claimant is wholly unable to function, so that a mild impairment is defined as an inability to function at all up to 10% of the work day. As many vocational experts consider a 10% off task limitation to be work preclusive, this would force a conclusion that anyone with a mild mental limitation in any domain would be unable to work. On the form, Dr. Mooney also endorsed selections indicating that the claimant would be absent five or more days per month due to sleepiness, and the claimant's condition would be likely to deteriorate if she were working full time, as the stress of full-time work would cause sleep attacks and cataplexy (Exhibits 6F and 7F). Dr. Mooney completed another attorney form in March 2017, in which she indicated that the claimant had narcolepsy episodes several times a day lasting up to two hours, and cataplexy episode several times a day lasting for minutes, assertions that have no support in her treatment notes. She also indicated that the claimant had a depressed mood and would deteriorate if she were placed under stress. Dr. Mooney stated that stress, illness, reduced sleep or naps, and lack of medication were all known triggers/exacerbators of narcolepsy (Exhibit 18F). In a progress note of October 2016, Dr. Mooney stated that she did not believe the claimant was employable due to her severe sleepiness and cataplexy and was totally and permanently disabled. As discussed above, in the same note she said the claimant was prescribed trazodone which worked well for her, though she did not use it every night, was alert and oriented, and did not drive while sleepy (Exhibit l9F/3). Taken in conjunction with Dr. Mooney's statement that reduced sleep exacerbates the claimant's condition, it would appear that the claimant's voluntary decision not to use her sleep medication every night contributed to symptom severity. The evidence appears to show that Dr. Mooney saw the claimant briefly in follow-up every three months and based her opinion almost exclusively on the claimant's subjective report of her symptoms rather than on objective clinical data, as she consistently observed the claimant to be alert and oriented rather than drowsy. For example, while Dr. Mooney did describe the claimant as drowsy at patient encounters in December 2014 and March 2015 (Exhibit 4F/57, 58), between July

2015 and January 2017 she consistently described the claimant as alert and oriented during seven patient encounters, and simply as pleasant and in no acute distress on an eighth occasion (See Exhibits l 6F and l 8F). This appears to suggest that the claimant's medication regimen was effective in controlling her symptoms, as Dr. Mooney herself indicated in the treatment notes discussed above. Dr. Mooney's opinion as to the claimant's need for days off and frequency of cataplexy symptoms appears to be at best a guess based on the claimant's subjective reports, although her treatment notes contain little discussion of symptom frequency. In March 2015, the claimant reported cataplexy 2 to 3 times a week (Exhibit 4F/57). None of Dr. Mooney's treatment notes indicate any observation of cataplexy, which would appear unusual if the claimant were really experiencing these episodes 100 times per day. The only example of cataplexy identified in progress notes states that the claimant reported that she dropped a bowl of cereal when she laughed, which does not appear to support a finding that her cataplexy is work preclusive. There is nothing in Dr. Mooney's treatment notes to suggest that either sleepiness or cataplexy would prevent the claimant from engaging in employment, as she is able to drive a car, participate actively in the county fair with her children and other interested people, and perform other activities of daily living described above. The claimant admits that she drives a car regularly with her children present, suggesting that she herself believes that it is not an unsafe situation as long as she does not drive when she is drowsy. Since the claimant recently reported that she was sleeping well with medication and was not napping, her statement suggests that drowsiness does not appear to be pervasive despite her responses on the Epworth self-reports (Exhibit 19F/l). Moreover, Dr. Mooney's support of the claimant's employment as a housekeeper (*Id*. at 22) is inconsistent with her assertion that the claimant is unable to work and would be unable to tolerate workplace stress. Dr. Mooney does not provide sufficient clinical and laboratory data to support her conclusions. Further, her conclusion of disability addresses an area that is specifically reserved to the Commissioner under Social Security Ruling 96-5p. Because of the lack of objective evidentiary support, Dr. Mooney's opinions are given little weight.

(R. at 25–27.)

After considering the discussion above, the undersigned finds that the ALJ gave good reasons for assigning little weight to Dr. Mooney's opinion. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Friend*, 375 F. App'x at 550; *Tilley*, 394 F. App'x at 222. Plaintiff nevertheless insists that substantial evidence does not support the ALJ's assessment of Dr. Mooney's opinion, raising several challenges. First, Plaintiff complains that the ALJ did not properly evaluate Dr. Mooney's opinion because the ALJ believed that the form completed by Dr. Mooney was

noncompliant and improperly redefined terms defined by the Social Security Administration ("SSA"). (ECF No. 8 at 8–9.) However, as evident from the ALJ's discussion above, the ALJ did not reject Dr. Mooney's opinion simply because he believed that Dr. Mooney used a noncompliant form or relied on improperly-redefined SSA terms. Instead, reading the ALJ's opinion as a whole, the ALJ considered multiple factors and relied on the medical record evidence when deciding to assign little weight to Dr. Mooney's opinion. (R. at 25–27.) Plaintiff's first argument is not well taken.

Plaintiff next contends that the ALJ mischaracterized the evidence and "cherry pick[ed]" the evidence when he discounted Dr. Mooney's opinion because it was based on subjective reports of symptoms and Dr. Mooney consistently observed Plaintiff to be alert and oriented rather than drowsy. (ECF No. 8 at 9.) Again, Plaintiff's argument is not well taken. The ALJ thoroughly considered the medical evidence (R. at 21–27) and explained why this evidence did not support Dr. Mooney's opinion, which was based on Plaintiff's subjective report of her symptoms. (R. at 25–27.) *Cf.* 20 C.F.R. § 404.1527(c)(2) (providing that a treating physician's opinion is entitled to controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence"), 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."). For example, the ALJ noted that, other than a couple of occasions in March 2015 and December 2014 when she noted that Plaintiff was drowsy (R. at 367–68), Dr. Mooney consistently observed Plaintiff to be "alert and oriented x3" in patient encounters between July 2015 and January 2017. (R. at 26, 492–98, 528–30.) While Plaintiff contends that the ALJ's discussion in this regard reflects cherry picking of evidence, the ALJ reasonably

considered this conflicting evidence in the record and substantial evidence supports his decision to use it as a factor in discounting Dr. Mooney's opinion. *See DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014) ("The District Court observed that this allegation [cherry picking] is seldom successful because crediting it would require a court to re-weigh record evidence. It is no more availing on appeal."); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) ("[W]e see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("Here, substantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data."); *Morrow v. Comm'r of Soc. Sec.*, No. 1:18-cv-0403, 2019 WL 1428199, at *12 (N.D. Ohio Mar. 29, 2019) ("Where there is conflicting evidence concerning the need for a cane, it is the ALJ's task, and not this court's, to resolve conflicts in the evidence."); *cf. Dawson v. Comm'r of Soc. Sec.*, 468 F. App'x 510, 513 (6th Cir. 2012) (finding ALJ properly discounted a treating physician's opinion where the physician's conclusions were inconsistent with his own progress notes). Moreover, "'even if there is substantial evidence in the record that would have supported an opposite conclusion[,]'" the Court defers to the ALJ's decision. *Blakley*, 581 F.3d at 406 (internal citations omitted); *see also Schmiedebusch v. Comm'r of Soc. Sec.*, 536 F. App'x 637, 649 (6th Cir. 2013) ("The ALJ retains a 'zone of choice' in deciding whether to credit conflicting evidence.").

The undersigned is likewise not persuaded that the ALJ impermissibly substituted his lay opinion for Dr. Mooney's opinion. (ECF No. 8 at 9–10 (identifying the offending opinion as "'[t]his appears to suggest that the claimant's medication regimen was effective in controlling

her symptoms. . . .'"").)  In so arguing, Plaintiff cites to only part of the ALJ's sentence and omits that the ALJ observed that Dr. Mooney herself noted that medication was effective in controlling Plaintiff's symptoms.  (R. at 26 ("This appears to suggest that the claimant's medication regimen was effective in controlling her symptoms, as Dr. Mooney herself indicated in the treatment notes discussed above."); *see also* R. at 19 ("Quarterly notes from the claimant sleep physician show that she did not generally nap, and got a full night sleep on the nights that she chose to take her sleep medication[.]"), 20 ("The claimant reports pervasive fatigue and drowsiness but quarterly notes from the claimant's sleep physician indicate that the claimant's symptoms appear to be in generally good control with stimulant medication during the day, as discussed in the review of evidence below."), 24 ("She was getting more sleep with her new medication and taking Nuvigil for daytime wakefulness.  She had no side effects with either medication.  Dr. Mooney considered the claimant's narcolepsy with cataplexy to be stable on the current medication regimen.").)  This record therefore establishes that instead of substituting his own lay opinion for the treating physician's opinion, the ALJ fairly characterized Dr. Mooney's own findings.  (*Id.*)

Plaintiff next contends that the ALJ incorrectly concluded that objective evidence did not support Dr. Mooney's opinion and that the ALJ improperly discounted her opinion for relying on subjective reports because Plaintiff's an assessment of narcolepsy and cataplexy require subjective reports.  (ECF No. 8 at 10–11.)  Plaintiff's argument is not well taken.  As a preliminary matter, while Plaintiff points out that Dr. Mooney considered the results of a sleep study and "review of prior physician's notes" (ECF No. 8 at 10 (citing PAGEID No. 410 [R. at 374]), Dr. Mooney's notes regarding this evidence is dated September 2014 and go to the diagnosis of Plaintiff's narcolepsy and cataplexy rather than reveal the extent of any limitations

caused by these conditions. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition."); *Malicoat v. Comm'r of Soc. Sec.*, No. 1:17-cv-811, 2019 WL 1305861, at *1 (S.D. Ohio Mar. 22, 2019) ("However, a mere diagnosis alone is not determinative of the ultimate disability issue.") (citing *Higgs*, 880 F.2d at 863; *Young v. Sec'y of Health and Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990)); *Robinson v. Comm'r of Soc. Sec. Admin.*, No. 1:18-cv-290, 2019 WL 342432, at *10 (N.D. Ohio Jan. 28, 2019) ("But a diagnosis, alone, does not establish a functional limitation caused by that condition.") (citing *Young*, 925 F.2d at 151). Moreover, the ALJ reasonably discounted Dr. Mooney's opinion to the extent it was based on subjective reports for the reasons previously discussed and because the ALJ explained why Plaintiff's reports were not entirely consistent with other evidence in the record. (R. at 22, 26.) For instance, the ALJ noted that while Plaintiff testified to episodes of cataplexy 100 times a day, Dr. Mooney never reported observation of cataplexy, "which would appear to be unusual if the claimant were really experiencing these episodes 100 times per day." (R. at 19, 22, 26, 54.) In addition, the ALJ noted that the only example of cataplexy identified in the progress notes was when Plaintiff reported that she dropped a bowl of cereal when she laughed, which instance the ALJ concluded did not support a finding that cataplexy was work preclusive. (R. at 26.) For all these reasons, the undersigned finds no error in the ALJ's reasoning in this regard. *See Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (""The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor.") (citations omitted); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (providing guidance in considering ALJ's credibility assessment).

Plaintiff goes on to argue that the ALJ mischaracterized the facts when stating that nothing in Dr. Mooney's treatment notes suggest narcolepsy or cataplexy would prevent her from engaging in employment because of her abilities to engage in various daily life activities. (ECF No. 8 at 11.)  Plaintiff specifically complains that the ALJ incorrectly asserted that Plaintiff herself actively participated in the county fair where her husband and children showed rabbits and a meeting was held in her home.  (*Id*.)  However, a psychological report dated January 29, 2015, reflects that Plaintiff was on the Knox County Fair Board in the summer.  (R. at 306.)  In any event, as the Commissioner points out, even if the ALJ did misconstrue Plaintiff's level of participation in the county fair, the ALJ considered Plaintiff's ability to drive a car and ability to engage in other activities of daily living, including socializing by phone and text with family, cleaning, shopping, and cooking.  (R. at 20, 24–26, 44–45, 61–64, 231, 236–38, 306.)  The ALJ's opinion therefore reasonably considered the record evidence reflecting Plaintiff's activities of daily living.  *See* 20 C.F.R. § 404.1529(c)(3)(i) (daily activities may be useful to assess nature and severity of claimant's symptoms); *Warner v. Comm'r of Soc. Sec*., 375 F.3d 387, 392 (6th Cir. 2004) ("The administrative law judge justifiably considered [the claimant's] ability to conduct daily life activities in the face of his claim of disabling pain.").

Finally, Plaintiff argues that the ALJ's assessment of Dr. Mooney's opinion was defective because he failed to discuss the required enumerated factors.  (ECF No. 8 at 11–12.)  As previously noted, however, there is no requirement that the ALJ "expressly" consider each of the *Wilson* factors within the written decision.  *See Tilley v. Comm'r of Soc. Sec*., 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).  Here, the ALJ's decision

thoroughly considered the record evidence, including Plaintiff's testimony and treatment history with Dr. Mooney. (R. at 20–27.) For this reason and all the reasons previously discussed, the ALJ's assessment enjoys substantial support in the record. Accordingly, it is

**RECOMMENDED** that Plaintiff's first contention of error be **OVERRULED**.

## B.    Chronic Fatigue Syndrome

Plaintiff next contends that the ALJ erred when he failed to recognize and therefore consider Plaintiff's chronic fatigue syndrome ("CFS") as a medically determinable impairment. (ECF No. 8 at 13–15.) Plaintiff specifically argues that the ALJ's failure in this regard means that "the ALJ gave no consideration to Ms. Moody's CFS and the potential impact that it would have on her residual functional capacity." (*Id*. at 13.)

Plaintiff's argument is not well taken. The ALJ is required to consider all objective medical evidence in the record where such evidence is produced by an acceptable medical source. 20 C.F.R. § 404.1512(b); 20 C.F.R. § 404.1513; *Minor v. Comm'r of Soc. Sec.*, No. 12-1268, 2013 WL 264348, *16 (6th Cir. Jan. 24, 2013). In addition, in formulating a RFC, the ALJ is required to consider "all the relevant medical and other evidence in [the] case record," including evidence of impairments that are not considered to be "severe" at step two of the sequential evaluation process. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a); *see also Nejat v. Comm'r of Soc. Sec.*, 359 Fed. App'x 574, 577 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-8p, 1996 WL 374184 at *5 (1996)) ("After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'") (emphasis in original). A failure of the ALJ to consider all of a claimant's records or symptoms in developing an RFC generally constitutes reversible error. *Cf. Malone v. Comm'r of Soc. Sec.*, 507 Fed. App'x 470, 472 (6th Cir. 2012)

(finding no reversible error in the RFC determination "because the ALJ considered all of the symptoms that were consistent with the medical evidence in determining his residual functional capacity"); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (concluding that reversal is required where the agency fails to follow its own procedural regulations where the regulation is intended to protect claimants). Further, "[i]t is an elemental principle of administrative law that agencies are bound to follow their own regulations." *Wilson*, 378 F.3d at 545. Even if the aggrieved party appears to have little chance of success on the merits, courts generally will not find the procedural error to be harmless. *Id.* at 546. "To hold otherwise . . . would afford the Commissioner the ability to violate the regulations with impunity and render the protections promised therein illusory." *Id.*

In addition, at step two of the sequential evaluation, a plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Heston v. Comm'r of Soc. Sec.,* 245 F.3d 528, 534 (6th Cir. 2001). A "severe impairment" is defined as an impairment or combination of impairments "which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). "Upon determining that a claimant has one severe impairment the ALJ must continue with the remaining steps in the disability evaluation." *Hobbs v. Comm'r of Soc. Sec.*, No. 1:14-cv-121, 2015 WL 4247160, at *5 (W.D. Mich. July 13, 2015) (citing *Maziarz v. Secretary of Health & Human Services,* 837 F.2d 240, 244 (6th Cir. 1987)). "Once the ALJ determines that a claimant suffers from a severe impairment, the fact that the ALJ failed to classify a separate condition as a severe impairment does not constitute reversible error." *Hobbs*, 2015 WL 4247160 at *5 (citing *Maziarz,* 837 F.2d at 244). An ALJ can consider non-severe impairments in determining the RFC. *Id.* "The fact

that some of [the claimant's] impairments were not deemed to be severe at step two is therefore legally irrelevant." *Anthony v. Astrue,* 266 F. App'x 451, 457 (6th Cir. 2008).

Here, the ALJ found that Plaintiff had severe impairments of narcolepsy with cataplexy, depressive disorder, and anxiety disorder. (R. at 18.) While the ALJ did not specifically classify CFS as a severe or non-severe impairment, the ALJ nevertheless went on to consider Plaintiff's allegations of fatigue in his discussion and at the remaining steps of the disability determination, including when assessing her functional limitations. (R. at 20–22, 25.) Accordingly, the ALJ's failure to include CFS as an additional severe impairment at step two is legally irrelevant. *Anthony,* 266 F. App'x at 457; *Maziarz,* 837 F.2d at 244.

Even if the ALJ erred by failing to find CFS a medically determinable impairment, the error is harmless. In addition to the reasons above, references to CFS or "chronic fatigue disorder" in the record simply reflect a diagnosis of this condition. (R. at 344, 347, 377, 381, 385, 390, 395.) For the reasons previously discussed, however, the "mere diagnosis" of CFS says nothing about the severity of the condition. *Higgs,* 880 F.2d at 863; *see also Malicoat*, 2019 WL 1305861, at *1; *Robinson*, 2019 WL 342432, at *10.[3] If the Court remanded the case and the ALJ resolved this issue in Plaintiff's favor by finding that CFS was a medically determinable but non-severe impairment,

> which is the best result Plaintiff could hope for were the case to be remanded—the key question would then be "whether the ALJ's decision not to find any limitations arising from the condition in question is supported by substantial evidence." *See Rose v. Comm'r of Soc. Sec.*, 2015 WL 6735313, at *5 (S.D. Ohio Nov. 4, 2015), *adopted and affirmed*, 2015 WL 7779300 (S.D. Ohio Dec. 2, 2015). Where, as here, Plaintiff identifies no such limitations, and it is not apparent that any exist, the error made by the ALJ is harmless. It would certainly be better practice were an ALJ to say explicitly which impairments are found to be non-severe and which are found not to be medically determinable, but ordering a remand for clarification

---

[3] As the Commissioner notes (ECF No. 14 at 12 n.6), Plaintiff's counsel at the hearing did not identify CFS when listing Plaintiff's medically determinable impairments. (R. at 42.)

of that question when the ALJ's residual functional capacity finding would not change would be an exercise in futility.

*Rouse v. Comm'r of Soc. Sec.*, No. 2:15-cv-0223, 2017 WL 163384, at *4–5 (S.D. Ohio Jan. 17, 2017), *report and recommendation adopted*, No. 2:16-cv-0223, 2017 WL 1102684 (S.D. Ohio March 24, 2017) (finding that even though error had occurred it did not justify a remand). It is therefore **RECOMMENDED** that Plaintiff's second contention of error be **OVERRULED**.

## VII.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Based on the foregoing, it is therefore **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED**.

## VIII.   PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g., Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted).


Date:  August 13, 2019                                 *s/ Elizabeth A. Preston Deavers*
                                                        ELIZABETH A. PRESTON DEAVERS
                                                        CHIEF UNITED STATES MAGISTRATE JUDGE